<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| | Plaintiff, | Civ. No. 09-1791 (DRD) |
| v. | | **O P I N I O N** |
| GEORGE J. ALBINSON, et al., | | |
| | Defendants. | |

*Appearances by:*

PAUL J. FISHMAN
United States Attorney
by: Peter G. O'Malley, Esq.
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102

     *Attorneys for Plaintiff,*

LAUFER DALENA CADICINA JENSEN & BOYD
by: William M. Laufer, Esq.
23 Cattano Avenue
Morristown, NJ 07960

KORNFELD & ASSOCIATES, P.C.
by:  Randy Kornfeld, Esq.
570 Lexington Avenue, 17th Floor
New York, NJ 10022

     *Attorneys for Defendant.*

**DEBEVOISE, Senior District Judge**

The Amended Complaint alleges that George J. Albinson, a civilian employee of the United States Army, was involved in a fraudulent scheme, the goal of which was to have the United States Government (the "Government") pay a contractor and subcontractor for work they did not perform.  Albinson moves to dismiss the Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Albinson argues that the Amended Complaint does not meet the heightened pleading requirements for the three causes of action the Government asserts under the False Claims Act ("FCA"), 31 U.S.C. § 3729.  Albinson also moves to dismiss the Government's three common law claims for common law fraud, payment under mistake of fact, and unjust enrichment.  The Government argues that the pleadings meet the Rule 9(b) standard.  The Court will grant the motion in part and deny it in part, dismissing without prejudice the common law claims for unjust enrichment and payment under mistake of fact, but allowing the FCA and common law fraud causes of action to continue.

## I.  BACKGROUND

The original Complaint, filed April 15, 2009, asserted claims against Albinson and the other parties allegedly involved in the fraudulent scheme, including the manager of the contractor, Fred Berger, and the manager Anthony Oliva, and L.E.A.D. Industries ("LEAD").  The Court thereafter voluntarily dismissed its claims against Berger.  Albinson moved to dismiss the Complaint on August 27, 2009.  The Court held oral arguments on October 19, 2009 and, finding the pleadings to be deficient under Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), granted the motion with leave to amend the Complaint.  On December 1, 2009, the Government filed an Amended Complaint against Albinson and also obtained a clerk's entry of default as to Oliva and LEAD for failure to answer,

move, or otherwise respond to the original Complaint. On March 8, 2010, Albinson filed the present motion to dismiss the Amended Complaint. The Court held oral argument on May 3, 2010 and reserved decision.

The Amended Complaint alleges six causes of action against the Defendants, including: (1) knowingly presenting a false or fraudulent claim in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A); (2) knowingly making a false statement to get a  false claim paid in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B); (3) conspiring to defraud the Government by allowing or getting a false or fraudulent claim paid in violation of the FCA, 31 U.S.C. § 3729(a)(1)(C); (4) common law fraud; (5) payment under mistake of fact; and (6) unjust enrichment. The Amended Complaint seeks compensatory damages in the amount of $772,629.35; treble damages; a civil penalty of between $5,000 and $10,000 for each false or fraudulent claim that the Defendants made or caused to be made; pre-judgment and post-judgment interest; and costs.

The following sections describe the allegations of the Amended Complaint, which are, for the purpose of this motion only, accepted as true and construed in the light most favorable to the Government. Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Additionally, the Court will consider the documents incorporated by reference as exhibits to the Amended Complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420, 1426 (3d Cir. 1997).

The Amended Complaint alleges generally that the Defendants colluded as part of a fraudulent scheme to receive payment for work described in a Government contract that the contractor and subcontractor who were awarded the contract did not actually perform. The Government alleges that the contract called for updated computer workstations to be installed at the Picatinny Arsenal. The contractor and subcontractor instead performed remodeling work, but

3

submitted invoices purporting to seek payment for installing the workstations described in the

contract.  The Amended Complaint alleges that Albinson facilitated the scheme by (1) arranging

to have the contract administered by a government unit that normally would not have handled it;

and (2) signing invoices LEAD issued to Business Plus, certifying that the work had been

completed and payment to Business Plus was appropriate.

**A.     The Parties**

The Amended Complaint alleges that the Department of the Army, a unit of the

Department of Defense, maintains a facility called the Armament Research, Development, and

Engineering Center, Tank-Automotive and Armament Command ("ARDEC/TACOM") at the

Picatinny Arsenal in Picatinny, New Jersey, where George Albinson works as a civilian program

manager.  Albinson oversaw various computer-related projects at the Picatinny Arsenal, and

approved invoices for payment by government contractors and subcontractors.  (Am. Compl. ¶¶

7-9.)

The Business Plus Corporation of New Jersey ("Business Plus"), an information

technology ("IT") services firm, was hired as the main contractor for the job.  Fred Burger, vice

president and chief operating officer of Business Plus, reviewed and approved invoices for work

performed by Business Plus subcontractors and forwarded invoices to the Government for

payment.[1]  (Id. ¶¶ 10-11.)

L.E.A.D. Industries ("LEAD"), an interior office design company, performed

construction and demolition work as a Business Plus's subcontractor on the Picatinny Arsenal

job.  Anthony Oliva was a LEAD office manager who oversaw LEAD's personnel and generated

---

[1] Although Business Plus and Fred Berger are alleged to have participated in the scheme, neither
is named as a defendant in this action.  The Government asserted that the reason for their
omission was that they had settled the matter before the case was filed.

invoices for the company, including the invoices at issue in this suit.  Albinson had a personal

relationship with Oliva and Berger.  (Id. ¶¶ 12-14.)

      The General Services Administration ("GSA") is a federal procurement and property

management agency that acquires and provides products and services for United States

governmental agencies.  Generally, when federal agencies like the Army contract with GSA,

GSA acts on the agency's behalf in administering contracts for the maintenance and

improvement of federal buildings.  GSA is divided into eleven geographical regions, including

Region Two (Northeast and Caribbean Region), which includes Northern New Jersey, and

Region Three (Mid-Atlantic Region), which serves Southern New Jersey.  GSA's Office of the

Chief Financial Officer in Fort Worth, Texas ("Financial Officer"), remitted payments for

invoices in the Picatinny Arsenal job.  (Id. ¶ 15-16.)

**B.**      **Events Leading to the Formation of the Picatinny Arsenal Contract**

      The Government alleges that as part of the alleged fraudulent scheme, Albinson asked a

GSA region that does not normally service his area to administer the contract.  In February 2002,

Albinson requested the GSA Region Three to administer a contract for the design, development

and implementation of a Central Computer System Computer System Support Complex

("Central Computer System") at the Picatinny Arsenal, which is located in Region Two.

Generally, Region Two handled projects at Picatinny.  (Id. ¶ 19.)  An email dated February 20,

2002, from Albinson to a GSA Region Three representative states, in relevant part:

> I would like to officially request you to work on the above
> mentioned task order for GSA award and service.  I normally use
> the GSA Kansas region, however, they suggested to check with the
> mid Atlantic region because you folks may be better able to service
> subject requirements.

(Id. Ex. 1.)

A series of emails exchanged between Albinson and Berger on March 11, 2002, is referenced in detail in the Amended Complaint.  The first email in the series is from Berger to Albinson, and states:

> George, Just got this from Elizabeth.  This is finally moving fast. Please don't forward this note to anyone.  There are several items in description to include upgrading from 10 meg to 100 meg with VOIP, new electrical wiring, removing CAT 3 and replacing with CAT 5, replacing hubs, and connecting peripherals are being done, as you told me, by the post engineers and CITD.  As long as I am not being required to do this I have not [sic] problem.  Don't think we should change the [Statement of Work ("SOW")] as long as I won't be held accountable for this stuff.
>
> Although you have probably seen the SOW from GSA already, please don't let them know that I sent you this copy.

Albinson's response:

> Not a problem.  You know I wouldn't do that….
>
> Not a problem.  You know I wouldn't do that either (send to GSA).
>
> […]

Albinson wrote a subsequent email to Berger in the same series.  In relevant part:

> Don't sweat the small stuff (network upgrades, VOIP, etc).  It needs this computer orientation.  I told GSA I was sending cash on Weds [sic] of this week.  I will most likely over shoot CLIN one requirement.  Need to move $s (you understand) in this environment as quick [sic] as possible.  So, I mentioned we may need to get some credit back or move to another action.  She mentioned it was fixed and [Business Plus] could claim we can't do this… I told her you and I will work out the "small stuff".  If your [sic] not worried – either [sic] am I.  We are both taking RISK and should.  I trust so you should too.

(Id. Ex. 3.)

The Government asserts that Albinson's comment that the project "needs this computer orientation" meant that the project would not have been approved if it had not been for the contract's provision for the installation of computer systems.  (<u>Id.</u> ¶ 21.)

The Director of IT Solutions for the GSA's Mid-Atlantic Region summed up the events which lead to the GSA Region Three administering the Central Computer System Contract ("Contract" or "Statement of Work") as follows:

- On February 20, 2002, Janice Johnson (R3 Norfolk, VA based ITM) received an unsolicited call from George Albinson…requesting her to award a task order for his Central Computer System Support Complex (CCSSC) project.  Ms. Johnson informed Mr. Albinson that Picatinny was serviced by GSA Region 2.  Mr. Albinson said he knew this but still wanted her to place the order for him.

- On February 21, 2002, Mark Aucello (R3 IT Director) called Joe Urbanik (R2 IT Director) and informed him of the situation.  Region 2 personnel called Mr. Albinson and set up a meeting for February 28th.

- At the February 28, 2002 meeting with Region 2 personnel, Mr. Albinson indicated that he would like Region 3 to award the task for his CCSSC project.  Mr. Albinson was aware Region 2 is the host GSA region for his activity but wanted Region 3 to put the CCSSC task in place for him. He indicated he would consider using Region 2 for future requirements.

- In a subsequent telephone conversation on February 28th between Joe Urbanik and Mark Aucello, it was agreed that Region 3 would issue the order for Mr. Albinson's CCSSC task as he requested.  It was also agreed that Region 3 has no intention of actively marketing or developing new opportunities at Picatinny and will inform Region 2 of any new opportunities which arise that are outside the scope of the CCSSC task for Mr. Albinson.

(<u>Id.</u> Ex. 2.)

C.       **The Work Performance**

The resulting Contract, awarded to Business Plus on March 21, 2002, involved the installation of computer workstations, updating computer wiring and designing an IT network, but did not include any construction other than minor repairs incidental to the installation of computer workstations.  Business Plus did not perform any work in connection with the Contract, but subcontracted the installation of computer workstations to LEAD.  In turn, LEAD did not perform any of the computer work authorized by the terms of the Statement of Work, but performed construction work at the site, including demolition of existing computer workstations, carpet removal and installation, and construction of walls and ceilings.  (Id. ¶¶ 22, 24.)  Elizabeth Robertson, the GSA employee who administered the Contract, had multiple conversations with Berger during which Berger stated that he understood that the Contract only involved IT-related work and not general construction work.  (Id. ¶ 23.)  Albinson acknowledged that neither Business Plus nor LEAD performed any of the work authorized by the terms of the Contract. (Id. ¶ 24.)

Instead of Business Plus or LEAD performing the work described in the Contract, in or about January 2003 to December 2003, a third party, Arenson Office Furnishings, an office space designer and authorized dealer and installer of Knoll, Inc. brand office cubicles and furniture, installed the Knoll brand computer workstations at the Picatinny Arsenal.  The ARDEC/TACOM paid Knoll directly for the furniture, which in turn paid Arenson for the labor. Business Plus and LEAD were not involved in the furniture installation, and in fact could not have been, since neither is an authorized dealer or installer for Knoll.  (Id. ¶¶ 25, 46.)

Additionally, Picatinny employees installed the computer wiring at the job site (a task included in the Statement of Work) at a cost of approximately $86,945 to the Army.  Business Plus and LEAD were not involved in the installation of the wiring.  (Id. ¶¶ 26, 47.)

The "Reporting/Billing" section of the Statement of Work stated:

> For each deliverable delineated in this Statement of Work, the contractor shall present a Milestone Completion Form to the client agency for their signature.  This form shall describe the Deliverable and the associated cost that matches the cost for that deliverable that was accepted in the contractor's proposal.  It shall be signed by a representative of the contractor company and the Government agency's Client Representative signifying acceptance of the work performed.
>
> Invoices shall be sent to the "Mail Invoices To:" section of the Form 300.  Included with the invoice will be all backup documentation such as, but not limited to, the Milestone Completion Form signed by the Client Representative.

(Id. Ex. 4.)

The Statement of Work lists George Albinson as the Client Representative.

**D.    The Invoices**

Oliva, on behalf of LEAD, generated invoices in connection with the work performed by LEAD at the job site ("LEAD invoices").  The invoices were forwarded to Berger at Business Plus to be paid.  Some LEAD invoices bore Albinson's signature and his title, program manager. In turn, Berger, on behalf of Business Plus, created its own set of invoices ("Business Plus invoices") to be submitted to GSA's Financial Officer for payment.  (Id. ¶¶ 27-28.)  Albinson was both the "customer" and the "client representative" for the project, so his signature on the LEAD invoices was the certification that GSA needed to authorize payments to Business Plus. The Government asserts that by signing the invoices, Albinson falsely certified that the work listed in them had been performed.  (Id. ¶ 55.)

9

An initial set of LEAD invoices described construction work performed at the job site, including demolition of existing office furniture, and removal and replacement of carpeting, and construction of walls and ceilings.  However, later invoices state that LEAD installed workstations.  (Id. ¶ 27.)  Some of LEAD's monthly expenditure statements describe construction work, even though they correspond to time periods described by LEAD invoices which describe workstation installation.  (Id. ¶ 29, Ex. 7, 9.)[2]

Berger instructed Oliva as to how the invoices should be worded.  (Id. ¶ 30, Ex. 5.)  The Government asserts that these instructions were part of the scheme to falsify invoices.  (Id. ¶ 23.) On behalf of the Army, Albinson signed invoices reflecting the wording Berger had told Oliva to use.  (Id. ¶ 28, 51.)  An email sent from Berger to Oliva on January 9, 2003, states:

> Tony, I need three sheets of paper from you.
>
> First—a letter signed by George accepting delivery of Deliverable 1g – Successfully implemented the new CCSSC structure within the new and expanded guidelines established by Picatinny Arsenal – dated 31 December 2002 from you NO MONEY LISTED ON FORM.
>
> Second—a letter signed by George accepting delivery of Deliverable 1h – Successfully ensured that all elements in the expanded CCSSC met Picatinny Arsenal safety and security policies and regulations – dated 31 December 2002 from you NO MONEY LISTED ON FORM.
>
> Third—an Invoice from you to me (not through George) billing me $32,009.49 for deliverable 1g and 26,412.73 for deliverable 1h.  Fred

(Id. Ex. 5.)

> Another email from Berger to Oliva, dated January 17, 2003, states:
>
> Tony, I couldn't get it to come out to exactly $144 so I did it this way.
> Please get George to sign an invoice from you to me for:
> 26 Workstations @ $5,512.88 for a total of $148,847.69
> Then send me the invoice.
> See, this is easier than the other way.  Fred

---

[2] See, e.g., LEAD invoices dated 3/24/03, 7/1/03, and 10/6/03, and corresponding LEAD monthly expense reports for the periods 1/28/03-3/24/03, 3/25/02-7/1/03, and 7/2/03-10/6/03.

Id.

The Amended Complaint claims that the following Business Plus invoices to the GSA were fraudulent:

| Number Assigned to Invoice in Amended Complaint | Business Plus Invoice Date | Number of Workstations Stated on Invoice | Amount Paid by GSA to Business Plus | Date GSA Paid Business Plus |
|---|---|---|---|---|
| 1 | 4/11/03 | 3 | $17,530.95 | 3/16/03 |
| 2 | 4/30/03 | 44 | $257,120.60 | 6/10/03 |
| 3 | 7/10/03 | 53 | $299,293.70 | 8/12/03 |
| 4 | 8/21/03 | 6 | $35,061.90 | 12/8/03 |
| 5 | 9/23/03 | 1 | $5,843.65 | 11/4/03 |
| 6 | 10/10/03 | 27 | $157,778.55 | 11/25/03 |

(Id. ¶ 56, Ex. 8.)

The Amended Complaint seeks compensatory damages in the amount of $772,629.35, a sum which corresponds to these six Business Plus invoices.

Albinson did not sign the Business Plus invoices, (Id. Ex. 8), but his signature does appear on many LEAD invoices, (Id. Ex. 7). The dates and amounts of three of the LEAD invoices, each of which is signed by Albinson and Berger, appear to correspond to some of the invoices cited in the above list:

| LEAD Invoice Date | Stated Amount Paid by Business Plus to LEAD | Number of Workstations Stated on Invoice |
|---|---|---|

| 3/24/03 | $242,566.72 | 44 |
| 7/1/03 | $237,053.84 | 43 |
| 10/6/03 | $137,822.00 | 25 |

(Id. Ex. 7.)

Richard Waibel, Albinson's supervisor, never directed Albinson to approve any of the LEAD or Business Plus invoices related to this Contract.  Edward Ernstorm, who was involved in the day-to-day supervision of the work performed by LEAD and Business Plus, had no involvement in the creation of the Contract and likewise did not direct Albinson to approve any of the LEAD or Business Plus invoices related to it.  (Id. ¶¶ 31-32.)  Elizabeth Robertson stated that had she been aware that neither LEAD nor Business Plus performed any of the IT work listed in the Contract, she would have halted all payments to Business Plus and cancelled the Contract.  (Id. ¶ 23.)

## II.  DISCUSSION

The Amended Complaint asserts that subject matter jurisdiction is proper under the FCA and 28 U.S.C. §§ 1331 and 1345.  Albinson argues that the allegations of the Amended Complaint are inadequate under Federal Rule of Civil Procedure 9(b).  The Government asserts that its pleadings meet the Rule 9(b) heightened pleading standard.

### A.    Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  When considering a motion under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court's inquiry "is not whether plaintiffs will ultimately prevail in a

trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the standard for a motion to dismiss under Rule 12(b)(6) in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, the Court in Bell Atlantic held that "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 545. The assertions in the complaint must be enough to "state a claim to relief that is plausible on its face." Id. at 570. The plausibility standard requires that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (in order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949. Although for the purposes of a motion to dismiss the court must assume the veracity of the facts asserted in the

complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950.  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  Id.

**B.     Documents and Facts Offered by Albinson in Support of his Motion to Dismiss**

Albinson submitted a number of documents, including two declarations, a letter regarding an award he received, and two series of email communications between Albinson and various other parties.  He also attempted to weave a narrative countering the Amended Complaint's allegations by making factual assertions in his briefs.  On a Rule 12(b)(6) motion to dismiss, a district court should consider only the facts alleged in the pleadings, undisputed documents alleged or referenced in the complaint, and public records of which the Court may take judicial notice.  Steinhardt Group Inc. v. Citicorp, 126 F.3d 144, 145 & n.1 (3d Cir. 1997); Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd., 181 F.3d 410, 426-427 (3d Cir. 1999).

The Court cannot consider Albinson's proffered documents in the context of this motion. Although the Government does not dispute their authenticity, none are referenced in the Amended Complaint, so it cannot be said that the Government's claims are based on any of the documents Albinson offers.  Cf. Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993) (determining that the operative purchase and sale agreement attached to the defendants' motion to dismiss was properly considered on a Rule 12(b)(6) motion because the complaint described its terms).  Albinson has not requested that the Court convert this motion to a motion for summary judgment, and in any case, the Court finds that it would be premature to do so.  It would be also be entirely improper in the context of this motion to dismiss for the Court

14

to consider either the factual assertions in Albinson's briefs or the additional documents he

presents.  The Court will consider only the Amended Complaint and the documents incorporated

in it by reference.

**C.      The Fraud Enforcement Recovery Act of 2009 Amendments to the FCA**

The FCA was amended by the Fraud Enforcement Recovery Act of 2009 ("FERA") on

May 20, 2009.  Pub. L. No. 111-21, 123 Stat. 1617 (2009).  The parties have not addressed the

issue of which version the Court should apply, even though they refer to different versions of the

FCA in their respective submissions.  The Defendant references the statute as it was amended in

2009, 31 U.S.C. § 3729(a)(1)(A), (B), and (C),[3] in his moving papers.  The Amended Complaint

---

[3] (a)      Liability for certain acts.  (1)  In general. Subject to paragraph (2), any person
who—

| | |
|---|---|
| (A) | knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; |
| (B) | knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; |
| (C) | conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); |
| (D) | has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; |
| (E) | is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true; |
| (F) | knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or |
| (G) | knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, |

is liable to the United States Government for a civil penalty of not less than $ 5,000 and
not more than $ 10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment
Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of
damages which the Government sustains because of the act of that person.

and the Government's submission on the other hand refers to the version of § 3729 that was in

existence before the amendment, 31 U.S.C. § 3729(a)(1), (2), and (3).[4]

>   Section 4(f) of FERA states that:

>   The amendments made by this section shall take effect on the date of enactment
>   of this Act and shall apply to conduct on or after the date of enactment, except
>   that (1) subparagraph (B) of [31 USC § 3729(a)(1)]…shall take effect as if
>   enacted on June 7, 2008, and apply to all claims under the False Claims Act that
>   are pending on or after that date.

Id.

>   The courts that have addressed § 4(f) have disagreed as to the meaning of "claims" in the

clause "shall…apply to all <u>claims</u> under the False Claims Act that are pending on or after [June

7, 2008]." <u>Id.</u> (emphasis added).  Some courts, including the Court of Appeals for the Second

Circuit, have read § 4(f) to mean that § 3729(a)(1)(B) applies to all cases that were pending on or

after June 7, 2008.  <u>See, e.g.</u>, <u>United States ex rel. Kirk v. Schindler Elevator Corp.</u>, 601 F.3d 94,

113 (2d Cir. 2010) (applying the new § 3729(a)(1)(B) "[b]ecause Kirk's claim was filed in

March 2005, and was pending as of June 7, 2008"); <u>United States ex rel. Stephens v. Tissue</u>

<u>Science Laboratories, Inc.</u>, 664 F. Supp. 2d 1310, 1316 (N.D. Ga. 2009) ("Because this action

was pending on June 7, 2008, the amended § 3729(a)(1)(B) applies to this action."); <u>United</u>

---

[4] (a)   Liability for certain acts—Any person who—
  (1)   knowingly presents, or causes to be presented, to an officer or employee of
        the United States Government or a member of the Armed Forces of the
        United States a false or fraudulent claim for payment or approval;
  (2)   knowingly makes, uses, or causes to be made or used, a false record or
        statement to get a false or fraudulent claim paid or approved by the
        Government;
  (3)   conspires to defraud the Government by getting a false or fraudulent claim
        allowed or paid;
  [….]
is liable to the United States Government for a civil penalty of not less than $ 5,000 and
not more than $ 10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment
Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of
damages which the Government sustains because of the act of that person.

States ex rel. Westrick v. Second Chance Body Armor, Inc., Civ. No. 04-280, 2010 U.S. Dist.
LEXIS 15870 *7 (D.D.C. February 23, 2010) (reading "claims" as legal claims and retroactively
applying new § 3729(a)(1)(B) "because this suit was pending on June 7, 2008").

        However, the majority of courts, including the Court of Appeals for the Eleventh Circuit
and this Court, have read "claims" in § 4(f) to refer to a defendant's fraudulent request for
payment, as defined by § 3729(b)(2).  See Hopper v. Solvay Pharmaceuticals, Inc., 588 F.3d
1318, 1327 (11th Cir. 2009) ("We interpret the word 'claim' in section 4(f) to mean 'any request
or demand … for money or property,' as defined by 31 U.S.C. § 3729(b)(2)(A) (as amended
May 2009)."); United States ex rel. Pilecki-Simko v. Chubb Inst., Civ. No. 06-3562, 2010 U.S.
Dist. LEXIS 27187, *14-16 (D.N.J. March 22, 2010); see also, United States ex rel. Bender v.
North American Telecommunications, Inc., 686 F. Supp. 2d 46, 49 n. 4 (D.D.C. 2010) ("'claims'
refers only to a defendant's request for payment, and not to pending cases."); United States ex
rel. Sanders v. Allison Engine Co., 667 F.Supp.2d 747, 752 (S.D. Ohio 2009) ("[A] plain reading
of the retroactivity language reveals that the relevant change is applicable to 'claims' and not to
'cases.'").

        The Court is persuaded, based on a plain reading of the statute and traditional cannons of
statutory construction, that the majority view is the correct one, and that the new § 3729(a)(1)(B)
applies retroactively in place of unamended § 3729(a)(2) only when a defendant's false claims
for payment were pending on or after June 7, 2008.

        There is a presumption that "[a] term that appears in several places in a statutory text is
generally read the same way each time it appears." Ratzlaf v. United States, 510 U.S. 135, 143
(1994).  Under 31 U.S.C. § 3729, a "claim" is a "request or demand…for money or property."
Therefore, under that principle of statutory construction, it is fair to assume that by using the

term "claim" in § 4(f) (which amends § 3729), congress meant "claim" to mean a fraudulent request for payment, not a legal claim or cause of action.

Additionally, a reading of § 4(f)(1) in conjunction with § 4(f)(2) supports this interpretation.  Whereas § 4(f)(1) refers to "all <u>claims</u>…that are pending on or after" a specific date, § 4(f)(2) refers to certain portions of FERA and states that those portions will apply retroactively "to <u>cases</u> pending on the date of enactment."  Pub. L. No. 111-21 (emphasis added).  The use of the word "cases" in the context of a retroactivity provision in § 4(f)(2), when compared with the use of "claims" in § 4(f)(1)'s retroactivity provision signifies that Congress intended to differentiate between the two terms.  To give meaning to both portions of FERA as a single document, the Court must assume that Congress would have written "case" if it meant case in § 4(f)(1).

Thus, the Court will apply the unamended version of the statute in this case, § 3729(a)(2) (2008), to Count Two because the Government has not alleged that the defendants submitted any false claims for payment that were still pending on June 7, 2008.  Additionally, the Court will apply the unamended version of the statute to Counts One and Three, § 3729(a)(1) and (3), since FERA states that the amended versions of those provisions "shall apply to conduct on or after the date of enactment."  <u>Id.</u>   The conduct alleged here occurred in 2002 and 2003.

## D.      Counts One, Two and Three: Violation of FCA, 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3)

The Court will now proceed to Albinson's motion to dismiss with respect to the FCA causes of action.  Albinson argues that the Government failed to allege these causes of action with sufficient particularity to satisfy Rule 9(b) pleading standards.  Specifically, Albinson argues that the Amended Complaint fails to allege (1) that he knew the LEAD invoices were

false; (2) that he received any kickbacks; or (3) that he presented or caused any claim to be presented; or (4) that the claim Business Plus submitted was actually false.

The three sections of the FCA under which the Government asserts its causes of action against Albinson share many common elements.  Count One alleges a violation of § 3729(a)(1), which implicates any person who "knowingly presents, or causes to be presented…a false claim for payment or approval."  To establish a prima facie claim under § 3729(a)(1), a plaintiff must show that:  (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.  United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004) (citing Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 182 (3d Cir. 2001)).

Count Two alleges a violation of § 3729(a)(2), which makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  To make out a prima facie case under § 3729(a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved. Schmidt, 386 F.3d at 242.  Although § 3729(a)(2) does not contain the same presentment requirement as § 3729(a)(1), the Supreme Court has stated that (a)(2) does require a showing "that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'"  See Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 128 S. Ct. 2123, 2130 (2008).  For the purposes of § 3729(a)(1) and (a)(2), the statute defines "knowingly" as (1) having actual knowledge of the information, (2) acting in deliberate ignorance of the truth or falsity of the information, or (3) acting in reckless disregard of the truth or falsity of the information.

Count Three alleges a violation of § 3729(a)(3), which implicates any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." A § 3729(a)(3) claim requires specific intent; it does not require "that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." Allison Engine, 128 S. Ct. at 2130.

i.      *The Government's Theory of Liability Against Albinson*

The Court will begin by examining the contours of the legal theory the Government is asserting against Albinson. Albinson argues that the Government has not alleged that he "directly" presented any claims. (Pl.'s Br. 10.)

The presentment requirement of § 3729(a)(1) compels "a plaintiff to prove that the defendant 'present[ed]' a false or fraudulent claim to the Government." Allison Engine Co. v. United States ex rel. Sanders, 128 S. Ct. at 2129; see also United States DOT ex rel. Arnold v. CMC Eng'g, 564 F.3d 673, 677 (3d Cir. 2009). However, the Government does not allege that Albinson directly presented a false claim for payment to the Government or any other party. Rather, the false claims that the Amended Complaint alleges were presented to the Government—the six Business Plus invoices reflecting work described in the Statement of Work but not performed—were presented by Business Plus, not Albinson, who was the program manager on the job.

A defendant may be implicated by the "causes" to be presented or "causes" to be made clauses of the § 3729(a)(1) and (a)(2) even if she was not the actual presenter or the one making the statement. The classic "causes to be presented" scenarios occur, for instance, where one person's false claim or statement is actually submitted by another party, a subcontractor submits

a false claim or statement to a prime contractor who innocently passes it on to the government, or a party makes a false claim to public benefits and an innocent person actually presents the claim. See John T. Boese, Civil False Claims and Qui Tam Actions, § 2.01(A)(2) (Aspen Publishers, 3d ed. 2006) (collecting cases in which courts interpreted the "causes to be presented" clause and describing principal factual scenarios to which it has been applied). The Government does not appear to be attempting to present this type of "causes to be presented" theory of liability, since the allegation clearly is not that Albinson submitted a claim to an innocent party, who in turn submitted it to the government.

The Court of Appeals has recognized potential § 3729(a)(1) liability for causation in circumstances that do not fit into the scenarios described above. In Schmidt, 386 F.3d at 243, the Court of Appeals noted that "a party may assist the filing of a false claim in other ways." The Court of Appeals reiterated that Congress, by extending FCA coverage to those who "cause" a false claim to be presented and who "conspire" to obtain payment for such claims, meant the FCA to reach "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." Id. (quoting United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943)).

In Schmidt, the defendant, a manufacturer of orthopedic implants, designed a marketing scheme to increase its market share. The marketing scheme allegedly caused participating hospitals to submit false claims for Medicare benefits. The complaint alleged that the defendant knew that if the scheme were successful, it would cause the hospitals to submit false claims. Schmidt, 386 F.3d at 235-44. The Court of Appeals applied "ordinary causation principles from negligence law in determining responsibility under the FCA." Schmidt, 386 F.3d at 244 (citing

United States ex rel. Cantekin v. Univ of Pittsburgh, 192 F.3d 402, 416 (3d Cir. 1999)) (using the

Restatement (Second) of Torts to analyze superseding causation in the context of a FCA claim).

The Schmidt Court found that it was reasonable to infer that the defendant's marketing scheme

was a substantial factor[5] in bringing about the hospitals' false filings, since the filings were "a

normal consequence of the situation created by the scheme [so the defendant] could be said to

have caused, and thus be responsible for, that filing."  Id. at 244-45.

 The crux of the Government's theory of causation here is that Albinson falsely certified

compliance with the Statement of Work when he signed the LEAD invoices.  The Statement of

Work provided that Albinson, as the client representative, was to sign Milestone Completion

Reports signifying acceptance of the work performed.  The Statement of Work required invoices

to the GSA to include all backup documentation such as the Milestone Completion Form signed

by the client representative.  The Government argues that the LEAD invoices were the false

records that were submitted to obtain payment for work that was not done; and that the emails

between Albinson and Berger before the Contract was awarded show that Albinson knew that the

invoices were intended to obtain payment for work that was not performed.  (Pl. Br. 27.)  Thus,

the Government argues, Albinson's signature on the LEAD invoices falsely certified that the

work described in the contract had been completed.

 The "certification theory" of FCA liability is based on a false representation of

compliance with a contract term, statute, or regulation, when payment is conditioned on

compliance with that requirement.  United States ex rel. Quinn v. Omnicare, Inc., 382 F.3d 432,

441 (3d Cir. 2004).  Factually false certification "involves incorrect description of goods or

services provided or a request for reimbursement for goods or services never provided," whereas

---

[5] According to the Restatement (Second) of Torts § 431, an actor's "conduct is a legal cause of
harm to another if his conduct is a substantial factor in bringing about the harm."

legally false certification involves a false representation of compliance with a federal statute, regulation, or prescribed contractual term.   Id. (quoting United States ex rel. Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001)).  Since the Government alleges that the LEAD and Business Plus invoices incorrectly described work performance and requested payment for goods and services never provided, the Government's certification theory in this case can be categorized as asserting "factually false" certification, rather than "legally false" certification.  Cf. Quinn, 382 F.3d at 441 n.11.

As the Court of Appeals has noted, a false certification theory may be based on an express or an implied certification of compliance.  See Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303-04 (3d Cir. 2008).  The implied version is the "most expansive version of th[e] theory," since in the case of implied certification, "liability can attach even when the entity receiving the funds has not expressly certified that it complied with the regulations it violated; all that is required is that the entity has received payment from the Government without disclosing that it has violated regulations that affect its eligibility for payment."  Id.  It appears that the Government here is asserting an express certification theory, since it alleges that Albinson signed the LEAD invoices, signifying his acceptance of the work that he knew LEAD and Business Plus did not plan to perform.

The Court of Appeals has twice declined to adopt the false certification theory of FCA liability, but each time it left the open door for this theory of liability in future cases.  See Rodriguez, 552 F.3d at 303-04 (declining to address the viability in the Third Circuit of the false certification theory because the complaint before it failed to assert that the government's disbursement decision was linked to the alleged violations); Quinn, 382 F.3d at 441 (holding that, even assuming the applicability of the false certification theory, the plaintiff could not

prevail under it because he did now show that specific drugs dispensed contrary to applicable regulations had been paid for by the government).

However, the Court of Appeals in <u>Schmidt</u>, 386 F.3d at 243,[6] implicitly found that a complaint based on a false certification of compliance with the Stark Act stated a claim upon which relief could be granted.  Although the Court of Appeals in that case did not expressly analyze the viability of false certification theories, it did state in the context of its analysis that "a false certification of compliance with applicable law creates liability under the FCA when certification is a prerequisite to obtaining a government benefit."  <u>Schmidt</u>, 386 F.3d at 243 (alterations in original) (quoting <u>United States ex rel. Hopper v. Anton</u>, 91 F.3d 1261, 1266 (9th Cir. 1996)).  The Court of Appeals reasoned in <u>Schmidt</u> that "[a] certificate of compliance with federal health care law is a prerequisite to eligibility under the Medicare program."  Thereafter, it concluded that "[the plaintiff] alleged a violation of the FCA when he alleged that [the hospital] certified its compliance with federal health care law knowing that certification to be false."  <u>Id.</u> The Court of Appeals then rested on that assumption in its analysis of the defendant's potential liability by asking whether the complaint sufficiently alleged that "[the defendant] knowingly assisted in [the hospital's] false certification."

<u>Schmidt</u> was issued after <u>Quinn</u> but before <u>Rodriguez</u>.  <u>Rodriguez</u> did not cite <u>Schmidt</u> when it stated that the Court of Appeals had "yet to adopt in a holding the false certification theory, either in its express or implied version."  552 F.3d at 303-04.  Then, after <u>Rodriguez</u>, another decision of the Court of Appeals cited <u>Schmidt</u> for the proposition that "falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA."  <u>United States ex rel.</u>

---

[6] <u>Schmidt</u> was issued after <u>Quinn</u> but before <u>Rodriguez</u>.  <u>Rodriguez</u> did not cite <u>Schmidt</u> when it stated that the Court of Appeals had "yet to adopt in a holding the false certification theory, either in its express or implied version."  552 F.3d at 303-04.

Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009).  The Court of Appeals in

Kosenske declined to decide whether the false certification would give rise to liability because

the district court had not reached that issue below.

       Although the Court of Appeals has not explicitly accepted either the express or implied

theory of false certification liability, it is clear that the more expansive implied theory is the more

difficult one to accept.  Since under the implied theory, liability can attach even when the entity

receiving the funds has not expressly certified that it complied with the regulations it violated,

courts run the risk of compromising the knowledge requirement because liability may attach

even without an express act.

       The overwhelming majority of courts have extended FCA liability to a party's knowing

false certification of compliance with applicable regulations, statutes, or contracts, when

compliance with the applicable requirement is a condition of payment.  See, e.g., United States

ex rel. Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001); United States ex rel. Siewick v.

Jamieson Sci & Eng'g, Inc., 214 F.3d 1372, 1376 (D.C. Cir. 2000); Harrison v. Westinghouse

Savannah River Co, 176 F.3d 776, 786-87, 793 (4th Cir. 1999); United States ex rel. Thompson

v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997); United States ex rel.

Hopper v. Anton, 91 F.3d 1261, 1266-67 (9th Cir. 1996).  The Court is persuaded that the false

express certification theory should apply in this matter.  The Amended Complaint alleges that the

Statement of Work required Albinson to certify acceptance of the work performed by the

contractors.  The Statement of Work's provision that Albinson signed acceptance should be

submitted to the GSA with the contractor's invoices gives rise to an inference that payment was

conditioned on the Albinson's acceptance of the work.

Accepting the express false certification theory, the question here becomes whether the Amended Complaint states a claim with sufficient particularity under Rule 9(b) that Albinson knowingly assisted in Business Plus's submission of the false claims by falsely certifying acceptance of the work that was actually not completed, such that he could be said to have caused Business Plus's submissions to be presented to the Government.  The Court finds the Amended Complaint presents a legally cognizable claim for relief against Albinson for his involvement in the alleged scheme.

      *ii.*     *Rule 9(b)*

The Court of Appeals has held that FCA causes of action must be plead with particularity in accordance with Federal Rule of Civil Procedure 9(b).  <u>Schmidt</u>, 386 F.3d at 242 n.9.  Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Rule 9(b)'s heightened pleadings standard "gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements."  <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1417 (3d Cir. 1997).  "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."  <u>Federico v. Home Depot</u>, 507 F.3d 188, 200 (3d Cir. 2007).  While the specific circumstances or acts constituting fraud or mistake must be alleged with particularity, "[m]alice, intent, knowledge and other conditions of mind of a person may be alleged generally."  <u>Id.</u> (quoting Fed. R. Civ. P. 9(b)).

Although Rule 9(b)'s requirements are stringent, "courts should be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their fraud."  <u>In re</u>

Rockefeller Ctr. Prop., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002) (internal quotations

omitted).  Where it can be shown that the requisite factual information is particularly within the

defendant's knowledge or control, the rigid requirements of 9(b) may be relaxed.  Id.  However,

"even when the defendant retains control over the flow of information, boilerplate and

conclusory allegations will not suffice….[p]laintiffs must accompany their legal theory with

factual allegations that make their theoretically viable claim plausible."  Id. (internal quotations

omitted).

> iii.    Application of 9(b) to the Allegations of the Amended Complaint

The Government's allegations of fraud are sufficiently precise to pass muster under Rule

9(b).  The Government presented six specific claims that Business Plus submitted to the

Government based on LEAD invoices that Albinson signed.  The Statement of Work required

Albinson, the client representative, to sign reports signifying acceptance of the work performed.

The Government presents communications between Berger and Albinson in which Albinson

acknowledged that neither Business Plus nor LEAD would perform some of the work described

in the contract.  The Government's assertion that Albinson falsely certified that LEAD had

performed the tasks described in the Statement of Work is plausible.

As a preliminary matter, for the Court to find that the Amended Complaint alleges FCA

liability against any party in this case, a false claim or statement must have been presented to the

Government by some party to get a claim paid.  The Government argues that the relevant false

claims and statements here were the Business Plus invoices.  The Amended Complaint alleges

that a set of the LEAD invoices—corresponding to the six Business Plus invoices described

above—were false because they requested payment for work described in the Statement of Work

that LEAD did not perform.  A request for payment based on work that was never performed is

certainly the type of false claim that falls within the purview of the FCA.  This motion challenges the Government's theory of liability in connection with that claim as it relates to Albinson.

Albinson asserts that the Court cannot infer from the Amended Complaint that he knew the LEAD invoices were false.  For the purposes of § 3729, the statute defines "knowingly" as (1) having actual knowledge of the information, (2) acting in deliberate ignorance of the truth or falsity of the information, or (3) acting in reckless disregard of the truth or falsity of the information.  At the very least, the allegations support an inference that Albinson acted in reckless disregard of the truth or falsity of the information in the LEAD invoices requesting payment for the installation of workstations.

Albinson asserts that the Government must, yet has not, alleged that a scheme existed and specifically how it benefitted Albinson. He relies on a statement in <u>United States ex rel. Grubbs</u> <u>v. Kanneganti</u>, 565 F.3d 180, 190 (5th Cir. 2009), in which the Court of Appeals for the Fifth Circuit stated that "[s]tanding alone, raw bills…are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work."

The Government has presented much more than "raw bills" in this case, so this argument is unfounded.  The allegations present facts showing that Albinson and Berger discussed the requirements of the Statement of Work, and Berger communicated to Albinson that he did not plan to complete the tasks described in the Statement of Work, by writing:

> As long as I am not being required to do this I have not [sic] problem.  Don't think we should change the [Statement of Work ("SOW")] as long as I won't be held accountable for this stuff.

Thereafter, Albinson agreed not to forward Berger's note or information from the GSA to anyone.  Albinson stated that both he and Berger were taking risks.  Albinson on behalf of the Army signed LEAD invoices accepting performance of work that allegedly neither LEAD nor

28

Business Plus had completed.  These allegations make it plausible that Albinson knew the LEAD invoices were false and that his signature on them would cause the Government to pay Business Plus.

Albinson asserts that the Government's failure to allege that he gained some fiscal benefit from the alleged scheme, such as a kickback, is fatal to the Government's FCA causes of action. It is true that the Government failed to allege that Albinson benefitted monetarily from the alleged scheme.  In fact, the Government acknowledges in its brief that it does not have information about money Albinson may have received as part of the alleged scheme, by arguing that "additional discovery should be permitted to go forward to see if the 'money trail' can be picked up at this late date to determine the actual extent to which Albinson benefitted from the fraud."  (Pl. Br. 19.)

Albinson asserts that Rule 9(b), as stated by the Court of Appeals for the Fifth Circuit in the context of a FCA complaint, requires a complaint to detail what benefit a person obtained by making a false statement.  In <u>Grubbs</u>, 565 F.3d at 186, the Fifth Circuit stated that 9(b) requires a plaintiff to plead "the time, place and contents of the false representation[], as well as the identity of the person making the misrepresentation and what that person obtained thereby."  Albinson claims that the Amended Complaint cannot survive Rule 9(b) pleading standards if it does not allege what Albinson obtained as a result of the alleged fraudulent scheme.  The Court will decline to adopt such a stringent reading of Rule 9(b).  The Fifth Circuit stated in the very same decision that the "time, place, contents and identity standard is not a straightjacket for Rule 9(b)…[r]ather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act."  <u>Id.</u> at 190 (internal quotation marks omitted).  Other courts have also recognized that Rule 9(b) in the context of the FCA does not provide courts with

a mandatory checklist of what must be included in the complaint.  See, e.g., United States ex rel. Karvelas v. Melrose-Wakefield Hospital, 360 F.3d 220, 232 (1st Cir. 2004).  The Court finds that the Amended Complaint's assertion that Albinson was involved in the fraudulent scheme is bolstered by sufficient factual allegations that provide enough detail to pass Rule 9(b), even without a specific allegation that the scheme lined Albinson's pockets.

Albinson also argues that he had no motive to assist in the submission of a false claim. He asserts that "[i]f he knew the progress reports were false and the Army was not getting the benefit of its bargain, he would not have any motivation to sign the invoices to the detriment of his employer, the Army and his job prospects." (Pl.'s Br. 9-10.)  Albinson's assertion is logically flawed.  It is based on the assumption that because he is a government employee, he would never knowingly sign false invoices because he would have no incentive to harm the Government.  If the Court were to accept the premise underlying Albinson's argument, it would be accepting the statement that no government employee would ever defraud his or her employer.  Unfortunately, practical experience requires the Court to reject Albinson's flawed argument.

In terms of causation, Albinson argues that his role in the alleged scheme was most analogous to "[sitting] and watch[ing] as the bank was robbed."  See United States ex rel. Bartlett v. Tyrone Hospitals, Inc., 234 F.R.D. 113 (W.D. Pa. 2006).  Albinson refers the Court to two decisions, Bartlett, 234 F.R.D. 113 and Grubbs, 565 F.3d 180, and argues that these decisions present facts that are analogous to the case currently before the Court.  In Bartlett, 234 F.R.D. at 125, the district court found that two defendants—one which managed the hospital that had allegedly submitted false claims, the other which was aware of the submission of false claims because the plaintiff informed them about it—had not caused the alleged conspiring

defendants to submit false claims.  The district court reasoned that awareness of a scheme did not amount to causation.  Id. at 126.  Rather, those defendants "stood and watched as the other defendants are alleged to have defrauded the Government."  Id.  Similarly, in Grubbs, 565 F.3d at 192, the Court of Appeals for the Fifth Circuit found that a hospital was not liable because the reasonable inference from the complaint was that the hospital was "inadvertently and in the normal course of business processing the claims of services fraudulently exaggerated by its doctors."

Neither of these factual scenarios is analogous to the one presently before the Court. Here, Albinson's alleged involvement in the scheme does not amount to mere knowledge, and from the facts alleged in the Amended Complaint he did not appear to be just processing claims in the normal course of business.  Rather, Albinson's email correspondence shows that he was not only aware of the scheme, but that he participated in it, by taking risk, agreeing not to disclose information Berger gave him, and assuring Berger that he would not have be expected to perform portions of the IT work described in the Statement of Work.  Those statements, coupled with his unique position of accepting the work performed, allow the Court to infer that he was a part of the scheme, not an innocent bystander caught up in it.

Albinson also asserts that his signature was not actually a necessary certification, since the Amended Complaint only alleges in paragraph 28 that "[i]n many instances" Albinson signed LEAD invoices on behalf of the Army.  Albinson argues that if he did not sign every invoice, his signature must not have been necessary for the Government to pay the claim.  However, it does appears from the Amended Complaint that Albinson did sign three invoices that seem to correspond to the six Business Plus claims submitted to the Government.  (See Am. Compl. Ex. 7).  Additionally, Berger's emails requesting Oliva to obtain Albinson's signature to "accept[]"

delivery of certain "deliverables" adds further weight to the inference that Albinson's signature was necessary to obtain payment under the Statement of Work.  (See Am. Compl. Ex. 5.) Furthermore, as the Court explained above, the language of the Statement of Work gives rise to an inference that Albinson's signature accepting performance was necessary for the Government's payment of Business Plus's claims.  If Albinson wishes to dispute the Amended Complaint's factual contentions a motion to dismiss is not the proper vehicle.  If Albinson produces evidence showing, for example, that the parties' actions did not conform with that contractual language such that in practice, Albinson's signature had no effect on the GSA's decision whether or not to disburse payment to Business Plus, then he should present that information in the context of a motion for summary judgment.

Albinson also asserts that the LEAD invoices were not false, because LEAD actually did perform work described in the Statement of Work.  He argues that the work performed deviated from the Statement of Work only in that LEAD performed a higher percentage of construction work in comparison with installation work than was called for in the Contract.  (Def.'s Br. 14-15.)  These assertions are factual contentions that are inappropriate to resolve on a motion to dismiss.  Albinson might raise them in a motion for summary judgment.

The Court finds that the Amended Complaint meets the Rule 9(b) standard for particularity in allegations of fraud.  The Court will allow the Government's FCA causes of action, Counts One, Two and Three, to survive this motion to dismiss.

## G.    Count Four:  Common Law Fraud

The Amended Complaint asserts a claim for common law fraud. The five elements of common law fraud are: "(1) a material misrepresentation of the presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely

on it; (4) a reasonable reliance thereon by the other person; and (5) resultant damages." <u>Gennari</u> <u>v. Weichert Co. Realtors</u>, 148 N.J. 582, 610 (1997).  The principal difference between a FCA cause of action and one for common law fraud is that the FCA does not require reliance or damages.  Rule 9(b)'s heightened pleading requirements also apply to this cause of action.

  With respect to this claim, Albinson presents essentially the same set of arguments he presented in opposition to the FCA causes of action.  The Court will not revisit the arguments that are duplicative of the issues it has already reviewed; the Government has properly alleged that under the Statement of Work, Albinson's signature was required to accept the work performed and caused the Government to pay Business Plus's claims.  Albinson's communications with Berger raise an inference that he believed the LEAD invoices he was signing misstated key information about the work had that had actually been performed.  The Government was reasonable to rely on Albinson's signature in the manner stated in the Statement of Work.

  The only element that remains is the element of damages.  Albinson argues that the Government has not properly alleged that it suffered damages.  The Court disagrees.  The Government alleged that it paid Business Plus for IT work and office furniture installation that neither Business Plus nor its contractor performed.  The Government also paid Arenson Office Furnishings and Picatinny employees to perform the tasks that were described in the Statement of Work.  The Government alleges that it suffered damages by paying Business Plus for work it did not complete.  The Court finds that the alleged overpayment for that work meets the pleading requirements for damages.  The motion to dismiss is denied for Count Four.

**H.      Counts Five and Six:  Payment by Mistake of Fact and Unjust Enrichment**

Payment under mistake of fact and unjust enrichment are essentially duplicative and seek the same relief.  Under New Jersey law, a claim of unjust enrichment has two essential elements: (1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable.  Wanaque Borough Sewerage Auth. v. West Milford, 144 N.J. 564, 575 (1996).

Payment by mistake of fact is also a common law claim.  The Supreme Court has stated:

> The Government by appropriate action can recover funds which its
> agents have wrongfully, erroneously, or illegally paid.  No statute
> is necessary to authorize the United States to sue in such a case.
> The right to sue is independent of statute.

United States v. Wurts, 303 U.S. 414, 415 (1938) (internal quotation marks omitted).

Under both standards, if the Government made payments based on an erroneous belief that was material to the decision to pay, it is entitled to recover the payments.  See United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970).  The Government alleges that it was mistaken in its belief that the Business Plus or LEAD had performed the work for which Business Plus submitted invoices.

However, Albinson correctly argues that the Government has not alleged that he received any of the funds it paid Business Plus for the job.  The Government responds that United States ex rel. Hunt v. Merck-Medco Managed Care, 336 F. Supp. 2d 430, 451 (E.D. Pa. 2004), precludes this argument.  In that case, the defendant was a pharmacy benefit manager that provided benefits for health plans by furnishing mail-order prescription drugs to plan participants.  The defendant argued that the Government's payment under mistake of fact claim must fail because the government had not directly paid any money to the defendant.  Rather, the government paid the health plan, which reimbursed the defendant in the normal course of a

business relationship.  The Court found that "even if the payments…were filtered through a health plan, the money, or some portion of it, was ultimately paid [to the defendant] by the Government."  Id.

The facts of this case are not analogous.  Here, the Government does not allege that Albinson received payments in the regular course of business.  Rather, the Government asserts that Albinson may have received some financial benefit for his part in the alleged scheme.  But, having failed to allege any facts giving rise to an inference that Albinson received money from the Government, the claims for unjust enrichment and payment under mistake of fact—as against Albinson—must be dismissed.  If Government is able to uncover information allowing it to allege that Albinson benefitted monetarily from the alleged overpayment, it may move for leave to amend.  The Court will dismiss Counts Five and Six without prejudice.

### III.  CONCLUSION

For the foregoing reasons, the Court will deny the motion in part and grant it in part.  The Court will deny the motion to dismiss as to Counts One, Two, Three and Four, the FCA and common law fraud causes of action.  The Government's allegations give rise to a reasonable inference that as part of a scheme with LEAD and Business Plus, Albinson knowingly signed LEAD invoices accepting work on behalf of the Government that LEAD and Business Plus did not perform.

The Court will grant the motion to dismiss Counts Five and Six, however, because the Government has not sufficiently alleged a connection between the scheme and any Government money that Albinson may have received.  Counts Five and Six are dismissed without prejudice. The Government may move for leave to file a second amended complaint if it can cure this pleading deficiency.

35

The Court will enter an order implementing this opinion.


_____**s/ Dickinson R. Debevoise**_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: August 16, 2010